May it please the court, my name is Beth Fersky. I am co-counseling with Ms. Wood representing the petitioners Aman, Mita, Sharad, and Irmi Rahman in this case. As you know, this case has a lengthy procedural history. We have two principal arguments to make in this petition for review. Before you get to that, I just want to be sure what we're going to be arguing about. Because as I understand it, you didn't contest Rahman's frivolous asylum determination or Sharon or Sharon's withholding and cat claims in the opening brief. Those are waived, right? You're not going to argue those? Correct, Your Honor. Okay, great. So we are arguing two things. Primarily that the fabrication attributed to Aman should not harm the children because they did not intend to misrepresent themselves in their case. And furthermore, the court and the board found Aman frivolous, did not find the others to be frivolous. Principally, Irmi Rahman is a spouse of a lawful permanent resident and has three U.S. citizen children. And she is eligible for other benefits under the act. We take issue with the judge's preclusion of a good moral character finding. Excuse me, Irmi is married to an American citizen? Irmi is married to a lawful permanent resident. So why isn't she just making an application for an adjustment of her status? Well, she would like to. However, the attorneys for ICE oppose that. And I believe... Say that again? Well, the attorneys for the government have opposed that. We were trying to work out a solution with the government attorneys and they opposed it. On what ground? I believe it has something to do with the new administration's policies on fraud. I think that we might have been able to work something out under the old administration. In other words, the fraud that she allegedly committed in this case stands against her in the other case. Allegedly, yes. However, the law is actually that if it is not a frivolous finding on asylum or withholding, which actually the judge did not find the derivatives to be frivolous, she would be eligible to adjust with a misrepresentation waiver. Whose evidence did the judge find not to be frivolous? Well, looking at the judge's order, specifically on the last page of the judge's decision dated October 3, 2011, it says that Aman is found to have knowingly made a frivolous asylum application on November 20, 1998, and his claims were denied. There is no frivolous finding with regard to any of the other respondents in this case. In fact, the judge actually found that the children had been pressured into submitting the father's false statement along with their 589s, which actually generally... Wait a minute. My understanding is that this woman was there in the court, heard the lies, repeated lies, did nothing, said nothing, didn't dispute anything. Are you talking about the mother? Perhaps so. Maybe I'm mixing that up. Yes. The mother, Mita, the judge attributed the wife's silence, ascribed the fraud to the wife based on her silence in the testimony. However, the children were not actually included in the original application. They filed their own separate asylum applications in 2001. When you use the word children, I understand they are the children of the two, I'll call them the lead people in this case, but what age were they? Okay. So this is a little complicated. At the time that the family left Bangladesh, I believe they were three and four. At the time they entered the United States... That is various years. That was in 1987. At the time they entered Sweden, they were seven and... When the father first submitted his asylum application in 1998, they were 15 and 16. I'm curious about the time of the pressuring. You said that when the children were pressuring, they were the children. Yes. They were 17 and 18 at the time they filed their individual asylum applications. And the father at that point told them that they had to include his unsigned declaration because if they didn't, it would harm the interests of the whole family. So they, in effect, adopted his lies. Alternative facts. Well, when it came to the testimony, the daughter, Irmi, actually attempted to make corrections. She thought that these were mistakes, and she did attempt to make corrections at the time of her testimony. And I believe the son also made some reference to it. Had she received any benefit from the lies from before, before she made the corrections? I don't think so. I don't think she had actually gotten a work permit. In fact, she had actually been detained because she had been ordered in absentia, and she later filed a motion to reopen her case. But she said in April of 2007 that she entered the United States in 1991 through Los Angeles International Airport. And that is correct. The son and daughter entered with the wife in 1991 through Los Angeles International Airport. From Sweden. From Sweden. Our second argument pertains to the. . . In 1998, she entered again? No, she did not. And that was. . . She said so. Well, no, that was a discrepancy that she did attempt to correct at the time of her testimony. She realized that that error. . . Saying she entered in 1998 matched what the father had said. Correct. That was what her father had pressured her to say. So it's okay to lie when you're pressured? No, she. . . In fact, at the time of her hearing, she attempted to make corrections on the applications. And it was actually Ermey's attempt to make corrections that called attention to the fraud by the father. I guess what I'm struggling with, it seems like everybody. . . The father may have been the papa liar, but all of the other folks seemed to just piggyback on the lies and just ride through until they got challenged on it. And now what happened here? Well, I actually believe that Ermey, at the time of her first testimony, caught some of these problems and attempted to make corrections. That's my understanding. She missed a lot, didn't she? Well. . . In fact, she relied on other lies that were not corrected. When the application was filed in 1991. . . I mean, sorry, in 2001, she was pressured by her father. Yeah, but. . . And how old was she at that point? At that point, I believe she was 17. Okay. And Amman. . . Who is Amman the father? Amman is the lead applicant, Your Honor. And I would just say, I'm just going to speak for another two minutes in reserve rebuttal for Ms. Witt. They were all in a family, and the whole intent was to stay here as a family. And it's a fair reference, I think, that the lies of the father were for the benefit of the family who intended that way, and the family accepted those lies and sought the benefit from it. And then when those lies became too evident, they came up with alternative stories. It seems to me that one is responsible for the other. They did. . . At the time of the hearing, the children testified truthfully. Completely? At the time of the. . . You're right about this. Yeah. Are you sure that they were testifying truthfully on everything? Well, I believe that the written pleadings contained some inaccuracies, yes. Okay. So they lied in writing but didn't lie orally. Correct. That's good. So how are we supposed to differentiate those? They spoke the truth but not the whole truth. Okay. All right. It seems. Well, they did. . . Just the fact that Ermey and Trout did make corrections during the hearing. But only after she realized that they had caught up with her. I think that she was confused about the whole thing. My understanding is she was confused about the whole thing. So she signed something and she was confused about what she signed? I believe so, Your Honor. Is there a declaration in the record saying that? I think we just have her written testimony during the hearing on that issue. With regard. . . I would just like to speak for another 30 seconds. With regard to the father, we just would like to argue that he is still prospectively eligible for Convention Against Torture Relief. He continues to support the Bangladesh Samaj Tandrik Dal Party, which is an opposition party in Bangladesh. So our position is, despite the fabricated story in the 1990s, he was persecuted in the 70s and 80s. And he does continue to support an opposition party which is subjecting him to torture. At this point, I would like to stop the clock and reserve for Ms. Winsup-Rivado. Very well. Go ahead, counsel. May it please the Court. Dawn Conrad on behalf of the United States Attorney General. I'd just like to take a step back and clarify a few things about the procedural posture of this case because it is a bit confusing as petitioners did pursue a frivolous asylum claim for 12 years through the board and all the way up to this court where they were eventually successful on that claim. But the only thing currently before the court right now are Amman, who's the father, and his wife Mita's applications for withholding of removal in Convention Against Torture Protection, and Ermi's application for cancellation of removal, and Shirat's, I guess, request for voluntary departure. The court, the board and the IJ denied Shirat's request for voluntary departure and Ermi's request for cancellation of removal on the catch-all provision of the good moral character requirement, which this court lacks jurisdiction to review. It's held that that's a purely discretionary determination. So that's something the court doesn't really even have jurisdiction to consider at this point. Turning to Amman and his... Before you leave that, that means that we can't touch the application of Ermi and Shirat and must dismiss them for lack of jurisdiction. That's correct. That's what you're asking us to do. Yes. As to Amman and Mita, substantial evidence in this case supports the agency's adverse credibility determination. Amman's false testimony under oath and submission of fraudulent documents in support of his original asylum application involved both deliberate fabrications of incidents of torture in Bangladesh in the 1990s, when he was already living in the United States, and a completely fabricated story about his entry into the United States, and also hid the fact that the family had resettled in Sweden for three years before coming to the United States. Basically, that destroyed his credibility on all future claims for withholding, and also with Convention Against Torture Protection. Obviously, an adverse credibility finding does not render his application for... is not dispositive for his request for CAT protection. However, they have not pointed to any evidence outside that testimony that establishes a likelihood of torture in Bangladesh. Is there anything specific in his testimony? No. And actually, he failed to even credibly establish what political party he was a member of. He had a generalized fear, if you believe his testimony. Well, he believed he's going to be targeted either as a member of this political party called BSD or JSD, but it wasn't clear which member, which political party he's a member of, nor was there any... Cited no specific acts. He continued to argue that he suffered persecution in the 1970s in Bangladesh. Without saying what that persecution was. No, he did say that he was detained for 28 days as a result of his political activities. He said he was hit or something like that? Correct, correct. But basically, his long pursuit of a frivolous claim that was not even discovered, it was actually the court, the IJ that discovered this claim, by looking at all the documents that had been filed, all the applications that had been filed in this case, and finally noticing a discrepancy among the dates of entries. And then the agency, or DHS, had to spend time and resources uncovering this fraud. And only then, when they were confronted with actual evidence that they entered the United States in 1991, did they even admit to having fabricated this story regarding their entry in 1998 and the past persecution in the 1990s. And then with Mita, she was the one that... She was present in October 2004, when her husband did give the false testimony, both about their entry and about his persecution in the 1990s in Bangladesh. And she was silent during her husband's testimony, even though she was not prevented from testifying, and she could have testified if she wanted to. And she actually eventually received a grant of asylum based on this false testimony after this court's remand. If there's no further questions? I think not. We respectfully ask the Court to deny a petition for you. Thank you. All right. So we've got the second attorney who's going to do the rebuttal, I think. Right? Welcome. May it please the Court, I'm Judith Wood, and I'm here on the part of the petitioner. This case presented quite a problem, since the lead respondent didn't tell us anything about Sweden. And had we known that, we would have taken a totally different approach. Had we known that the family had actually lived in Sweden and that there was an issue of firm resettlement, we would have structured the case in an entirely different way, asking for withholding and perhaps convention against torture, and never would we have approached asylum. I have little doubt you would have done that, Counsel, but we have the record we have. And the reality is that there's very, very strong evidence here that there were just a tissue of lies throughout the whole thing. What are we to make of that? Are we supposed to say... Well, it was really shocking to me as well, Your Honor. Counsel, I'm sure it was. Were we supposed to say that Counsel would have structured it differently if they had known they came from Sweden? How do we deal with all the lies? Well, in light of the fact that he did lie about his refugee status in Sweden, the whole family got refugee status in Sweden, and he never told us about that, and it came out in the courtroom, in light of that fact, there's still some argument to be made that he's still eligible for relief under the Convention Against Torture. On what evidence? What he talked about before was shown to be a lie. So what do we believe? Well, it's true that he lied about many things. That doesn't mean that he wasn't tortured in the 70s in Bangladesh. So if he lies about 95% of things, are we supposed to presume that he didn't lie about the other 5%? Well, the Convention Against Torture is not a discretionary relief. If someone's going to be tortured in their home country... But you have to believe that they were, and that's the problem. And will be. And originally, when he was given refugee status in Sweden, apparently the Swedish authorities believed it, and this court... Doesn't bind us. The other thing, Your Honor, is that, aside from the principal, Aman, in this case, the children are really innocent victims of this whole situation. Well, we have no jurisdiction over them. Well, I think you do have jurisdiction to remand Ermey's case, at least, for voluntary departure, and perhaps for cancellation, and the brother, Sharada, as well. And the brother wants voluntary departure. That's what we're told. And we're told we have no jurisdiction over either. Well, while this case is before you, you have jurisdiction to adjudicate a remand for that form of relief, for either voluntary or cancellation. What ground? You may not be able to... Well, on her eligibility, her legal eligibility in the judge's findings, basically attributing the father's fraud in full to her. That means we exercise our jurisdiction when there is none. I mean, in fact, she tried to correct the fraud. She tried to tell the truth. Let it all be true, but if we have no jurisdiction, we can't get into it, can we? I think you do have jurisdiction. I've argued several cases in this Court where it was remanded for the relief of cancellation of removal. You may not have jurisdiction directly. Jurisdiction wasn't based upon a discretionary decision of the Attorney General, right? In this case, it is. So why do we have jurisdiction? Well, because it's a legal issue. It's not a... Jurisdiction. When it's a legal issue and not a discretionary issue, you do have jurisdiction to remand. What case can you cite to that effect? There have been several Ninth Circuit holdings... I'm talking about a name. A name of a case or cases that says that we have jurisdiction when the Attorney General has exercised discretion to do what's being asked in this case. What case? You don't have jurisdiction to adjudicate her cancellation. I admit that. You cannot remand and adjudicate her jurisdiction. And what case do you cite that says that we can remand it? I don't have the case on the tip of my tongue, Your Honor. Okay. Ms. Wood, we have a finding that there is not good moral character. And hence, you can't have her removal canceled and the brother can't have his voluntary departure request honored. What's there to adjudicate? We can't adjudicate that finding of bad moral character, can we? That would be an adjudication, and we're not allowed to do that. Neither one of the children have demonstrated, in our opinion, bad moral character. Let's say you're right, but there's been a finding. Can we take up the substance of that finding and say there's no basis to it? Can we do that? I believe so. I believe you can remand for voluntary... But that means we have jurisdiction. And it's very significant, and very significant in Ermey's case in particular because... I agree with you, but that means we have jurisdiction. Can't touch the finding of bad moral character unless you have jurisdiction to do that. Is there habeas jurisdiction? Is there review jurisdiction? What do we have? I beg to disagree with you. I think that you can... I'm asking you a question you can't disagree with me. As a matter of law, remanded for a finding of voluntary departure, and give Ermey the opportunity to apply for cancellation. But it's most significant in Ermey's situation because, as you know... Counsel, we're over time. Let me just ask my colleagues, do either of them have any additional questions? So we thank you and your co-counsel and the government for your presentations. We appreciate it, and the case just argued is submitted. Thank you very much.
judges: M. Smith, Owens, Hellerstein